### BORLAND v. NORTHERN TRUST SAFE DEPOSIT CO.

(District Court, N. D. Illinois, E. D. March 24, 1914.)

No. 29,771.

1. PATENTS (§ 26*)—PATENTABLE COMBINATION.

In order that an invention constituting a combination of old elements may be patentable, the constituents must so enter into the combination that each qualifies the other.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*]

2. PATENTS (§ 328*)—VALIDITY—INFRINGEMENT—SAFE DEPOSIT BOX LOCKS.

Borland patent, No. 940,300, for a safety deposit box lock, *held* valid, but not infringed by a double-nosed lock made under Roche patent, No. 860,940.

In Equity. Suit by Bruce Borland against the Northern Trust Safe Deposit Company. Decree for defendant.

Josiah McRoberts, of Chicago, Ill., for complainant.

George D. Seymour, of New Haven, Conn., and Robert H. Parkinson and Wallace R. Lane, both of Chicago, Ill., for defendant.

SANBORN, District Judge. Suit for infringement of patent No. 940,300, applied for June 14, 1905, issued November 16, 1909, to the plaintiff, on a safety deposit box lock. Defendant's locks were made under the Roche patent of July 23, 1907, No. 860,940. While the Roche patent was issued more than two years before Borland's, it was applied for June 1, 1906, nearly a year later.

The devices in question are changeable key locks, used chiefly upon safety deposit boxes, and are "double-nosed" locks; that is, the two or three keys go in separate keyholes. They are designed to be

opened by the use of two keys, one held by a person in charge of the safety deposit vault, known as the guard, and the other by the person who rents the box. Neither can open the door of the box-compartment without the co-operation of the other, or without the possession of both keys. When the box owner rents a box he is supposed to receive two duplicate keys, one or both of which he carries with him. When he wants access to his box, he goes to the vault, and either asks the guard to help him open the lock, or to lend him his key. The guard's key is a master key, which will unlock a dog so placed as to prevent the movement of the main bolt. When this dog is unlocked, the box owner may insert his key and slide back the bolt, while the guard's key remains in the lock.

So long as the same person retains a box, the simple double-nosed lock affords due protection to whatever securities or other valuable papers or property he may have placed in his box. But he may lose one or both his duplicate keys, or give up the box, or mistrust that the guard has in some way obtained a copy of his key, so it becomes desirable to change the lock-combination, to enable the box to be either rented to a new customer or retained by the former one, with a new key in place of the one lost. In tumbler locks, such as those in question here, in which the tumblers are normally held firmly together, the change is made by disengaging them, and then inserting a new renter's key to line them up so that the bittings or irregular edges of the key, if a flat one, will not only place the tumblers in a new position to be locked together, but will operate them in such new position. This disengaging operation is done by pivoting one set or part of the tumblers on an eccentric. Turning the eccentric one way pulls them apart, so their relative position may be changed by the new key, and turning it back joins or locks them in their new relation.

This resetting or changeable key mechanism, however desirable or necessary it may be, subjects the lock to the danger of surreptitious resetting by a dishonest guard. To avoid this a third or supplemental lock, governed by a third key, is provided, by which the resetting mechanism is locked and unlocked. This key is placed in the custody of the manager of the vault, thus making a criminal conspiracy between manager and guard necessary in order to change the renter's key and get the new one into his hands in place of the old one without his knowledge. This supplemental lock feature is Borland's sole claim to invention in this case, apart from the specific form of his device. The supplemental lock is old in the art, and was known as "St. Peter's lock," because, as explained by the witness Warren H. Taylor:

"St. Peter was supposed to carry the keys guarding the gates of Heaven; the name St. Peter was adopted as the name for this lock, as this guarded the securities or the opportunities of manipulating the tumblers in the combination of this lock, which was supposed at the time it was brought out to be one of the best and most secure locks that had ever been produced."

[1] The Borland device is a double-nose, three key lock, very highly organized for the purpose of making it unpickable, and to prevent irregular resetting. The feature of safety was made the chief consid-

eration in its construction. Tubular keys are employed, to avoid
picking and easy duplication, and the lock contains 15 tumblers. The
most important feature of this lock, however, which distinguishes it
from others, including defendant's, is the co-operation of all its parts,
each with the other; the resetting mechanism being part of the un-
locking and lock mechanism in daily use. This lock, as a combination
of old elements, comes more nearly within Justice Matthews' defini-
tion of a patentable combination than is usually found in combinations
which are sustained. In Pickering v. McCullough, 104 U. S. 310, 26
L. Ed. 749, Judge Matthews said:

"In a patentable combination of old elements, all the constituents must
so enter into it as that each qualifies every other."

The different elements in this lock are operatively tied together.
To open the safety box door part of the supplemental lock mechanism
must be used, while in other locks it is not. In defendant's lock no
use of the supplemental lock feature is made in ordinary opening and
closing, except to idle a disc in a nonfunctional way. The supple-
mental lock may be taken off entirely without affecting the everyday
use of the locking and unlocking, while in Borland the whole lock
would be destroyed.

It is urged by defendant that Borland did not bring forward the sup-
plemental lock feature in his patent application, nor until some two
years later, so that the Roche application of 1906 antedates him. But
the fact is that Borland fully described his supplemental lock in his
first specification. In fact, he could not explain his invention with-
out doing so, by reason of the complete co-operation of parts, and the
co-operative law which governs the whole device. His original figure
4 shows the resetting mechanism on the back of the lock, and figure
14 the manager's key. On June 8, 1905, Borland fully describes his
resetting mechanism shown in figure 4, and other cuts, including the
third or manager's key, shown in figure 14. He closes this descrip-
tion as follows:

"Then both the new key" (meaning the fourth key, or new depositor's
key) "and the manager's key may be withdrawn, the withdrawal of the
former returning the locking tumblers and associated gears to their locking
positions, while upon the withdrawal of the manager's key the dog 84 is
thrown back into engagement with the disk to hold the post 30 against move-
ment."

The supplemental lock is thus fully described by Borland at the
outset.

Original claim 21, filed June 14, 1905, also covers the supplemental
lock in a blind way. It is true that Borland did not elaborate the no-
tion of a supplemental lock until long after Roche had filed his ap-
plication for a patent on what is now defendant's lock. But such is
the nature of Borland's invention that he could not describe the re-
setting operation without also ipsissimis verbis describing the supple-
mental lock.

[2] There could be no invention in merely adding a supplemental
lock to the permutation or resettable lock of the earlier art. This is

so far beyond controversy as to justify only a bare mention of a few of the prior devices. Speaking generally, all that Borland added to the Roche 1901 lock was a supplemental lock for the resetting mechanism, and to put that lock on the inside of the lock-case, so as to effectually guard against fraudulent resetting. The use of a supplemental lock was old, but the manner in which it was tied up to the old tumblers governed by the customer's key, and the guard's key driving gears, was not only entirely new with this inventor, but is not used by defendant, nor anything like it.

Numerous exhibits having a supplemental lock were shown at the hearing, such as several Yale locks dating back to 1872 and earlier. They are by no means so highly organized as the Borland, but they show beyond question that there could not possibly be invention in the mere adding of a supplemental locking device to any sort of a mutable key lock.

It is equally true that there could not be invention in merely putting the supplemental device inside the lock casing, both because this might involve only a change of position, and because it would not be novel, as shown by defendant's exhibits 18, 19, and 29, all dial locks with supplemental devices inside the lock casings; also by the Newell reissue, No. 208, of 1851. They are not to be compared in safety with Borland's lock, but the idea is there nevertheless. As plaintiff's expert says:

"There are in the prior art some so-called dial locks, not intended for use upon safe deposit boxes, and not adapted for such use, wherein access to the tumblers for resetting them to a new combination can be had only by the use of a key which must be inserted at the back of the lock, but in none of these dial locks having this supplemental key does this resetting require either a knowledge or a use of the combination required for opening the lock."

This is the same as saying that Borland has improved on the prior art by so associating the main and supplemental portions of his device as to protect it to an exceedingly high point. In fact, his invention is so highly organized that its practical usefulness is doubtful.

Between the Roche 1907 device, used by defendant, and the complicated but ingenious lock of the plaintiff, there are many differences, some functional and others not. Among those involving different means, operation, or result are the following: (1) The Roche supplemental lock is entirely separable from the other parts, while in Borland there can be no unlocking or locking without using it. It is only in the resetting operation that there is co-operation between the two-part tumblers and the supplemental lock. (2) The customer's key in each lock has an entirely different function, so far as insertion into the case is concerned. (3) In plaintiff's device the guard's key must be withdrawn before the manager's key can be used, thus making one functional operation necessary to reset plaintiff's lock, and rendering it safer. (4) The two manager's keys have different functions, one being used to undog the eccentric, and the other to turn it after being undogged by the renter's key.

Other differences appear when the operation of the two devices is carefully compared, as I will now attempt to do.

### Unlocking Borland device.

1. *Unlocking cam to operate latch-tooth.* Insert guard key and rotate back and forth to line up gatings of guard's tumblers to unlock cam 50 for engagement with latch.

2. *Coupling renter's drive gears to register gatings of supplemental lock.* Insert renter's key and rotate it to turn drive gears to register gatings of supplemental lock pinions in front of latch-tooth.

3. *Undogging main bolt.* Turn guard's key to actuate cam to lower the tail of the latch, and raising tooth into gatings, out of locking connection with bolt.

4. *Withdrawing main bolt.* Turn renter's key to left, swinging lower pinion of supplemental lock, to operate rack bar on bolt, and slide back the bolt.

The box door may now be opened.

### Unlocking defendant's device.

1. *Undogging main bolt.* Insert guard key, and turn to left.

2. *Retracting bolt.* Insert renter's key and turn to right. The box door may now be opened.

### Resetting Borland device.

(The door now being open, and the bolt retracted, the back of the lock is exposed, ready for resetting).

5. *Placing main bolt in locked position.* Turn renter's key opposite to direction in No. 4.

6. *Disengaging latch tooth.* Turn guard's key.

7. *Withdrawing guard's key.* As it is now necessary to use the manager's key in the guard's keyhole, the guard's key must be pulled out.

8. *Undogging eccentric.* Insert manager's key in guard keyhole, push in and rotate back and forth until it registers with the bottom tumbler, then turn to left to undog the eccentric, so that its post may be turned.

9. *Separating pinions from drive gears.* Manually turn thumb-nut on back of lock, thus turning eccentric, and unmeshing pinions from gears.

10. *Resetting to new combination.* Insert new renter's key, rearranging the drive gears according to the sinuous slot of the new key.

11. *Restoring eccentric to mesh.* Turn thumb-nut back to original position.

12. *Relocking eccentric.* This is done by withdrawing the manager's key, alternately rotating and pulling out; (seven motions in all).

### Resetting defendant's device.

3. Turn renter's key to left.

4. Turn guard's key to right.

5. *Placing supplemental lock in unlocking position.* Insert old renter's key and turn to right as far as possible.

6. *Unmeshing the counterpart tumblers.* This is done by inserting the manager's key, and turning it a half-turn, thus swinging the eccentric to separate the two-part tumblers.

7. *Resetting to new combination.* This is done by inserting the new renter's key, and turning it. The different bittings line up the separated tumblers to fit the new key.

8. *Remeshing the counterpart tumblers.* The manager's key is now turned back to reconnect the meshes.

9. *Locking eccentric.* Take out the manager's key, and the lock is restored to its condition at the beginning of resetting.

It would be difficult to find two locks more different in practical construction than those here in question. One is excessively complicated, slow, and difficult to operate; the other simple, rapid, and easy in operation. One has gear tumblers and gear wheel keys; the other the old two-part tumblers and flat-bitted keys. 'In one it is necessary to make four to seven separate movements of the key to fully insert it in the lock; in the other the key is simply pushed straight in by a single movement. In one the supplemental lock is an integral part of the main lock mechanism; in the other this lock is entirely separable, and may be removed without affecting the main lock. One has two keyholes; the other three. In one the bolt can be undogged only by the co-operation of guard and renter's keys, neither one of which can be dispensed with, while in the other the bolt is undogged by a simple turn of the guard key, and the guard lock may be taken out and still leave the lock operative, both for opening and closing and resetting. Some of these differences, no doubt, may be referred to equivalent functions; but there are too many radical contrasts to make it necessary to discuss the range of equivalents to which Borland is entitled. There are great differences in means and operation, even though result may be deemed substantially the same.

Many other questions were raised on the argument, and are fully covered by the briefs. One of them is that Borland obtained practically all his ideas and suggestions from defendant's officers and agents. While it is true that Borland got his first knowledge of the tumbler lock art from defendant, yet, as he fully described his complete supplemental and main lock mechanism early in June, 1905, I have not been able to find sufficient evidence to overcome his patent, as of the date of his application.

An attack is made on the Borland patent on account of representations made in the Patent Office to overcome the citation of the Taylor patent as a reference. I have not thought it necessary to decide this question, because I think noninfringement exceedingly clear. For the same reason, I have not fully considered the effect of the assistant commissioner's decision holding certain claims unpatentable in view of Taylor's supplemental lock.

Much is made of the fact that defendant's locks had been in its vault for nearly three years before Borland filed any claims directed to the supplemental lock feature, and that in May, 1909, long after the Roche 1906 application was made, covering the alleged infringing lock, he canceled all his original claims and all those of July, 1906, and inserted 36 new claims, which, it is alleged by defendant's counsel, was done to cover the Roche 1906 lock adopted by defendant. But I find all this immaterial, because Borland fully described his present lock, with its supplemental lock as an integral and absolutely essential part, early in June, 1905.

Because I regard the question of infringement so clear for defendant, also, I have not thought it necessary to carefully consider the asserted disclosure to Mossman of the Lips lock as made in Holland, or to determine whether such a disclosure was made as would amount

to prior knowledge without actual use of the Borland invention in this country.

Defendant's lock reads squarely on many of plaintiff's claims, but these claims by no means represent his actual invention, of which defendant makes no use. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136.

A decree should be entered sustaining plaintiff's patent, and that it is not infringed.